In re Donald W. BOSLEY, Deceased.

**Appeal of Kenneth T. Bosley.**

Superior Court of Pennsylvania.

Argued April 13, 2011.

Filed June 20, 2011.

Timothy Nieman, Harrisburg, for appellant.

Laura S. Manifold, Stewartstown, for Bosley, R., appellee.

Sharon Bosley, appellee, pro se.

BEFORE: PANELLA, LAZARUS and OTT, JJ.

OPINION BY LAZARUS, J.:

Kenneth T. Bosley ("Kenneth") appeals from the September 20, 2010 order of the Court of Common Pleas of York County, Orphans' Court Division, denying his appeal from probate and declaring void *ab*

*initio* a power of attorney executed in his favor by Donald W. Bosley ("Decedent"). After careful review, we affirm in part and reverse in part.

Decedent, the oldest of five children, was born in Maryland in 1916. He never married and had no children. Although Decedent was very limited in his ability to read and write, he acquired substantial assets during his life, including securities and three parcels of real estate in Maryland.[1] Decedent's family owned and operated a dairy farm, Conclusion Farms, on which he lived and worked for most of his life. Kenneth, Decedent's brother, attended college and earned his law degree in 1962.

In the early 1990's, a family dispute erupted over the disposition of Conclusion Farms, which was ultimately sold after a lengthy legal battle. As a result, Decedent was forced to move from his home into a trailer on another parcel of property he co-owned with Kenneth. The trailer had no running water or toilet facilities and Decedent heated it with open-flamed portable heaters. In approximately 2001, Decedent began living with his second cousin, Howard Bosley ("Howard") at his home in York County, Pennsylvania on a nearly permanent basis. Howard's son, David Bosley ("David"), appellee herein, lived in an adjacent home on the same property. By 2002, Decedent rarely returned to Maryland.

Decedent died on October 9, 2008, leaving a will dated December 19, 2003. In his will, Decedent gave to David two parcels of real estate located in Baltimore County,

Maryland; to his brother, Kenneth, six acres of land known as the "Murray Gerber home"; and to his siblings Kenneth, Glen M. Bosley, Sr., and Elizabeth B. Durham, the remainder of his real estate, as well as "all corporate stocks (except those in the name of [David] ) of which I may die seized and possessed, or in expectancy." Will of Donald W. Bosley, 12/19/03, at Item SECOND, ¶ 3. Decedent gave the residue of his estate to his sister, Elizabeth, or her surviving issue, or, if she predeceased him without issue, to his remaining heirs at law. Decedent appointed Howard as executor and David as alternate executor. Howard died in 2007.

Decedent had an earlier will, executed in 1987, under which he had disposed of his estate as follows: to his brother Daniel, his cows and the sum of $100; to Kenneth, the Murray Gerber home; to Kenneth and Glen, the remainder of his real property and all corporate stocks; and to Elizabeth, the residue. Decedent appointed Kenneth as executor, and Kenneth's son, Kenneth Webster Bosley, as alternate executor. The 2003 will explicitly revoked "any and all Wills and Codicils heretofore made by" Decedent.

On October 30, 2008, David submitted the 2003 will for probate with the York County Register of Wills and was granted Letters Testamentary thereon. On January 13, 2009, Kenneth filed with the Orphans' Court an appeal from the decree of the Register, seeking to invalidate the 2003 will on the grounds of undue influence and testamentary incapacity. He also filed a petition in which he sought David's removal as executor.[2] After a

---

1. The inventory filed in Decedent's estate values his assets in excess of $988,000, not including real estate and certain other assets. Trial Court Opinion, 9/30/10, at 3.

2. In addition, David and Kenneth filed cross-petitions, each seeking from the other an ac-

count of actions taken under powers of attorney executed by the Decedent. Both petitions were granted and accounts were filed. Objections to those accounts are still pending before the trial court.

three-day trial, the court issued an order on September 30, 2010, in which it, *inter alia,* denied Kenneth's appeal from probate, granted the petition to remove David as executor and declared void *ab initio* a power of attorney dated July 16, 2007, executed by the Decedent in favor of Kenneth. The trial court concluded that, although Decedent suffered from a weakened intellect and had a confidential relationship with Howard, Howard did not receive a substantial benefit under the 2003 will. The court further found that Decedent possessed sufficient testamentary capacity to execute a valid will.

Kenneth filed this timely appeal, in which he raises the following issues for our consideration:[3]

 I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT NEITHER HOWARD NOR DAVID RECEIVED A SUBSTANTIAL BENEFIT UNDER DECEDENT'S 2003 WILL AND THAT DAVID'S DEVISE WAS JUSTIFIED BY INDEPENDENT GROUNDS?

 II. WHETHER THE TRIAL COURT ERRED BY FAILING TO CONSIDER RELEVANT EVIDENCE INTRODUCED BY APPELLANT'S FORENSIC ACCOUNTANT AND MARGARET BOSLEY AS TO HOWARD'S UNFETTERED CONTROL OVER DECEDENT AND DECEDENT'S TESTAMENTARY PLAN FOR THE BENEFIT OF DAVID?

 III. WHETHER THE TRIAL COURT ERRED IN FINDING THAT DECEDENT POSSESSED THE REQUISITE TESTAMENTARY CAPACITY AT THE TIME HE EXECUTED HIS WILL?

 IV. WHETHER THE TRIAL COURT ERRED BY FINDING THAT THE 2007 POWER OF ATTORNEY WAS VOID *AB INITIO* WHEN THE ISSUE WAS NEITHER SQUARELY BEFORE THE COURT NOR GERMANE TO THE DISPOSITION OF ANY OTHER PENDING ISSUE?

 V. WHETHER THE TRIAL COURT ERRED IN APPLYING THE DOCTRINE OF UNCLEAN HANDS?

Brief of Appellant, at 4–5.

■ Our Supreme Court has held that our scope and standard of review on appeal from a decree of the Orphans' Court adjudicating an appeal from probate is as follows:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion.

*Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268, 1269–70 (1979). Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside. *Estate of Masciantonio,* 392 Pa. 362, 141 A.2d 362, 365 (1958).

■ The burden of proving undue influence is borne by the contestant once the formalities of probate are established, giving rise to a presumption of validity. *Estate of Clark,* 461 Pa. 52, 334 A.2d 628

---

**3.** We have combined, restated and/or renumbered Kenneth's issues for ease of disposition.

(1975). In order to meet this burden, the contestant must establish, by clear and convincing evidence, that: (1) the testator suffered from a weakened intellect at the time the will was executed; (2) there was a person in a confidential relationship with the testator; and (3) the person in the confidential relationship received a substantial benefit under the challenged will. *Reichel*, 400 A.2d at 1270. Once these three elements are established by the contestant, the burden shifts back to the proponent to prove the absence of undue influence by clear and convincing evidence. *Clark*, 334 A.2d at 631–32.

Kenneth first alleges that the trial court erred in finding that neither Howard nor David received a substantial benefit under the 2003 will. Specifically, Kenneth argues that the court erred by declining to apply the "collateral benefits" doctrine to impute David's benefits under the will to Howard because of their familial relationship as father and son. Kenneth relies upon *Estate of Button*, 459 Pa. 234, 328 A.2d 480 (1974), in which our Supreme Court reversed the decree of the trial court and held that the decedent's will had been procured through undue influence. As in this case, the beneficiaries of the will were not the individuals who had overborne the will of the decedent, but rather their children. However, the Court did not address the issue of substantial benefit in any detail, other than to mention in passing that the minor children were to receive nearly the entire probate estate. *Button*, 328 A.2d at 484. Instead, the Court's analysis turned on the failure of the proponents to demonstrate the absence of undue influence by clear and convincing evidence. As such, we find Kenneth's reliance on *Button* unavailing.

The trial court, in declining to apply the "collateral benefits" doctrine, relied upon *Estate of Simpson*, 595 A.2d 94 (Pa.Super.1991) and *Estate of Stout*, 746 A.2d 645 (Pa.Super.2000). In *Simpson*, this Court affirmed the ruling of the Orphans' Court, which had concluded that the proponent's receipt of a 25% share of the decedent's estate did not constitute a "substantial benefit." In addition, we determined that the lower court did not err in its "substantial benefits" analysis by failing to impute to the proponent the bequest made to the proponent's son, who was also a grandson of the decedent. We held that, since proponent's son was decedent's grandson there was "a sufficient, independent basis for the bequest to him." *Simpson*, 595 A.2d at 98.

In *Stout*, the appellant was the contestant of a will which he alleged was the product of undue influence against his aunt, the decedent, by his aunt's brother-in-law, the will's proponent. In her contested will, the aunt appointed proponent as executor, disinherited the appellant and gave the bulk of her estate to the proponent's son and that son's daughter. The proponent's son was decedent's blood nephew and his daughter was decedent's great-niece. The trial court determined that the proponent did not receive a substantial benefit under the will.[4] On appeal to this Court, the contestant argued that, although the proponent did not receive any direct benefit under the will, the bequests to his son and granddaughter should be imputed to him under the "collateral benefits" doctrine.

In affirming the holding of the trial court, the *Stout* Court reviewed this Com-

---

**4.** Generally, appointment as executor with the right to receive the usual and customary commissions attendant thereto has not been found to establish a "substantial benefit" such that a presumption of undue influence arises if the other two elements are satisfied. *See Stout, supra; Adams' Estate*, 220 Pa. 531, 69 A. 989 (1908).

monwealth's scant existent case law on the issue, as well as that from other jurisdictions, and concluded that: "[c]ases that have found a substantial benefit accruing to a testator's confidant via collateral benefits include factual circumstances where the confidant had unfettered control, extensive powers, absolute discretion or extensive decision-making powers over the testator's estate." *Stout,* 746 A.2d at 648. For example, in *Estate of LeVin,* 419 Pa.Super. 89, 615 A.2d 38 (1992), this Court found that a substantial benefit accrued to an executor/testamentary trustee where he was vested with the power to: (1) select the beneficiaries of the balance of the testator's $1.5 million estate; (2) revise the terms of the testamentary trust; (3) invest, sell or dispose of testamentary trust assets to realize income or gain; and (4) determine when and if the testamentary trust became impracticable to administer. *Id.* at 43. Likewise, in *Adams, supra,* our Supreme Court found there was a substantial benefit sufficient to shift the burden of proof where the confidant, who was appointed executor but otherwise not a beneficiary of the will, was also: (1) appointed as trustee, in control of the entire estate valued at approximately $75,000 and (2) a possible residuary beneficiary of the whole estate.

In *LeVin, supra,* this Court relied heavily upon the rationale of the Supreme Court of Alabama in *Zeigler v. Coffin,* 219 Ala. 586, 123 So. 22 (1929), in which the proponent of the challenged will was also its scrivener. The will created a trust, under which the proponent was appointed as trustee of 280 acres of land containing a dairy, sawmill, ore plant, farm and personal property. Under the terms of that testamentary trust, the proponent was given:

full and supreme power and authority over such property during the life of the [testator's] widow, to sell and convey, invest and re-invest, pay expenses, ac-

count to no court, with the right, but no duty to pay the profits realized to the widow during her life, then to terminate the trust. He could exercise his own judgment as to when he paid her anything. He was relieved of bond.

*Id.* at 23. In concluding that proponent was the recipient of "collateral benefits" sufficient to shift the burden of proof, the Alabama Supreme Court considered the following criteria:

[T]he nature of the trust, the amount involved, the amount of fees which the trustee will receive, whether he is the sole trustee, [the trust's] probable duration, his discretionary powers, and all the details of the trust[.]

*Id.*

We have carefully considered the cases cited by the parties and the trial court and performed our own exhaustive search of case law in Pennsylvania, as well as that of our sister jurisdictions. *See Allen v. Estate of Dutton,* 394 So.2d 132 (Fla.App. 1980) (absolute discretion to distribute bulk of estate to charities endows executor with sufficient collateral benefits to make him substantial beneficiary of will); *Estate of Nelson,* 232 So.2d 222 (Fla.App.1970) (non-beneficiaries received substantial benefit where: named both executors of will and trustees of estate; entitled to compensation for services to rendered; possess sole authority for fixing own fees; have uncontrolled discretion as trustees to decide for which religious, charitable, literary, educational, or scientific purpose assets of trust shall be expended, and amount to be allocated for each such purpose). We conclude that the trial court did not err in finding that Howard did not receive "collateral benefits" under the 2003 will as a result of the bequest to his son, David.

 In the matter *sub judice,* and unlike the cases cited above, Howard, as executor, was not given significant latitude or discretion in distributing Decedent's assets. Decedent was specific in all of his devises and bequests, leaving no room for any exercise of discretion as to the identity of beneficiaries or the amount of their gifts. Additionally, Decedent created no ongoing trust under which his executor might maintain control of Decedent's assets for any significant duration of time. Although the will contains boilerplate language granting to the executor the authority and powers necessary to effectively administer and distribute Decedent's assets, in reality, the executor possessed little or no latitude in the ultimate distribution of the assets of the estate.

Additionally, where an independent basis exists to explain a testator's bequest to a beneficiary, this Court has found the "collateral benefits" rule inapplicable. *See Simpson, supra; Stout, supra.* Here, the trial court credited testimony establishing that David had a familial relationship with the Decedent dating back to David's childhood, when he would spend time working with Decedent on the family farm and Decedent would pick him up from school. *Estate of Miller,* 2011 PA Super 48, 18 A.3d 1163 (2011) (Orphans' Court, sitting as finder of fact, determines credibility of the witnesses and will not be reversed except for abuse of discretion). Upon review, we conclude that the findings of the trial court in this regard are fully supported by the record. Accordingly, for all the reasons set forth herein, we find that the "collateral benefits" rule is inapplicable to the case at bar and that the trial court did not err in finding that Howard did not receive a substantial benefit under the 2003 will. As such, Kenneth's claim is meritless.[5]

Next, Kenneth claims that the trial court erred by failing to consider the "nearly full day" of testimony of his forensic accountant, as well as that of Decedent's neighbor and sister-in-law, Marguerite, regarding Howard's "unfettered control" over the Decedent and Decedent's testamentary plan for the benefit of David. Kenneth argues that the testimony of these witnesses is significant because Decedent's probate estate would have been larger had Howard not (allegedly) depleted it through transfers to himself using the power of attorney.[6] In addition, Kenneth asserts that Howard's "unfettered control" over Decedent's assets has probative value with regard to the "collateral benefits" analysis discussed above. For the following reasons, this claim is meritless.

Preliminarily, we note that Kenneth misapprehends the applicability to the collateral benefits analysis of testimony regarding Howard's alleged control over Decedent's assets *during his life.* Kenneth cites *Stout, supra,* upon which the trial court relied, in which this Court found that a common element to cases where the collateral benefits doctrine has been found to apply is that "the executor/trustee had control, discretion, or authority to dispose

---

5. Kenneth raises a similar claim that the trial court erred in failing to find that David received a substantial benefit under the 2003 will. That claim is also without merit. The extent of David's benefit is irrelevant, as David was not the individual in a confidential relationship with the Decedent. Additionally, it is questionable whether the receipt of two parcels of land constitutes a "substantial benefit" in the context of an estate valued at close to $1 million, exclusive of all real estate. In any event, we need not reach that issue.

6. We cannot help but note the irony of Kenneth's claim in this regard, given his own *inter vivos* transfer of the Decedent's property to himself using a power of attorney executed at a time when Kenneth himself claimed the Decedent lacked capacity.

of or act on behalf of the estate, rather than merely complying with the testator's directions." *Stout*, 746 A.2d at 648. However, the cases cited in *Stout* all involve significant control exercised by, or authority granted to, an executor *in his capacity as executor or trustee under the will*, and not control exercised under a power of attorney during the life of the testator. It is the power granted under the will itself that is germane to a determination as to whether the confidant receives collateral, substantial benefits thereunder. As discussed above, Decedent's will did not grant extensive powers to the executor.

■■■ With regard to the testimony presented by Kenneth at trial, a trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented. *Childress v. Bogosian*, 12 A.3d 448, 456 (Pa.Super.2011). The testimony of David Goss, CPA, the forensic accountant retained by Kenneth, focused exclusively on assets allegedly diverted by Howard to himself and/or David *during the Decedent's lifetime* while acting as agent pursuant to a power of attorney. As such, his testimony, while arguably germane to the issues of weakened intellect and confidential relationship present in this matter, is significantly more relevant to the prosecution of objections to the power of attorney account filed by David on behalf of Howard's estate, which is currently pending before the trial court, but not the subject of the instant appeal.

Finally, Kenneth has failed to demonstrate that he has been prejudiced by the alleged depletion of Decedent's estate by Howard. Under the will, Kenneth is the specific devisee of one parcel of real estate, which was never transferred out of the Decedent's name and remains a part of the estate. The residuary beneficiary of Decedent's will is his sister's son, Elmer Durham.[7] *See* Petition for Probate and Grant of Letters, filed by Glenn M. Bosley, Jr., 12/13/10. Thus, any depletion of the residuary estate by Howard's alleged *inter vivos* transfers would inure to the sole detriment of Elmer,[8] not Kenneth. For these reasons, Kenneth's claim is meritless.

Kenneth next argues that the trial court erred in finding that the Decedent possessed testamentary capacity at the time he executed his 2003 will. Specifically, Kenneth claims that the court erred by according the testimony of the scrivener, Attorney Jeffrey Gray, greater weight than that of Kenneth's expert witness, Dr. John Hume. Kenneth asserts that Attorney Gray's testimony is entitled to less weight because Howard "arranged [with Attorney Gray] for the preparation and execution of the 2003 will" and because "[Decedent] was not well-acquainted with Attorney Gray." Brief of Appellant, at 41. In support of his position, Kenneth relies on this Court's decision in *Estate of Mampe*, 932 A.2d 954 (Pa.Super.2007), in which we found that the trial court did not abuse its discretion by placing greater weight on the testimony of lay witnesses than that of the attorney/scrivener regarding the testator's weakened intellect. For the reasons set forth below, we conclude that this claim is meritless.

■■■ Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty,

---

7. The named residuary beneficiary under the 2003 will, Elizabeth Durham, predeceased the Decedent. Thus, under the terms of the will, her surviving issue, her son Elmer, receives the residuary estate.

8. We note that Elmer was not a party to either the will contest or the account proceedings with respect to the powers of attorney.

the general composition of his estate, and what he wants done with it, even if his memory is impaired by age or disease, and the testator need not have the ability to conduct business affairs. *Reichel,* 400 A.2d at 1270 (citation omitted). "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property." *Estate of Hastings,* 479 Pa. 122, 387 A.2d 865, 868 (1978), *citing Aggas v. Munnell,* 302 Pa. 78, 152 A. 840, 843 (1930). Testamentary capacity is to be ascertained as of the date of execution of the contested document. *Estate of Ziel,* 467 Pa. 531, 359 A.2d 728, 732 (1976).

■■■■ On the subject of Decedent's testamentary capacity, the trial court heard the testimony of: (1) the scrivener of the will, Attorney Jeffrey Gray; (2) the Decedent's treating physician from 2002 until 2008, Dr. E. Glenn Friedman; and (3) Dr. John Hume, an expert psychiatric witness who reviewed the Decedent's medical records but never met or treated the Decedent during his lifetime. The court accorded "superior weight to the testimony of Attorney Gray . . . and the testimony of Dr. E. Glenn Friedman . . . over the testimony of Dr. Hume." Trial Court Opinion, 9/30/10, at 47. The court found Attorney Gray's testimony regarding his meeting with the Decedent to be credible and noted that, even though Howard set up the appointment and communicated certain information to Attorney Gray ahead of time, "Attorney Gray was resolute in his testimony that the changes made in [Decedent's] 2003 will were 'not from Howard. They were from [Decedent], conveyed by Howard to me, and confirmed by [Decedent] at our meeting.'" *Id.* at 52–53. Furthermore, the trial court credited Dr. Friedman's testimony that "he did not ob-

serve any persistent confusion on [Decedent's] part during any of his numerous visits with [Decedent] in 2002 or 2003." *Id.* at 56.

Kenneth's reliance upon *Mampe, supra,* is misplaced. Whereas the question before us now is one of testamentary capacity, in *Mampe,* we were presented with a claim of undue influence, in which the relevant mental state is that of a weakened intellect. Weakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution. As our Supreme Court noted in *Clark, supra:*

> Undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The 'fruits' of the undue influence may not appear until long after the weakened intellect has been played upon. In other words, the particular mental condition of the [testator] on the date [he] executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity.

*Id.* at 634. Thus, a prior acquaintance with, or previous knowledge of, the testator is not as relevant to the issue of testamentary incapacity as it would be to a determination regarding weakened intellect. As such, the fact that Attorney Gray was relatively unfamiliar with Decedent does not render his testimony less relevant or less weighty. To the contrary, his impressions of the Decedent on the *very date* he executed his will are more probative of the Decedent's testamentary capacity than those of someone, such as Dr. Hume, who never met the decedent and formulated an opinion of Decedent's mental state based solely on medical records. Likewise, the testimony offered by Decedent's personal physician at the time of execution, Dr.

Friedman, was appropriately found by the trial court to carry more weight than that of Dr. Hume. In sum, we conclude that the findings of the trial court are fully supported by the record and we can discern no abuse of discretion in the court's finding that the Decedent possessed testamentary capacity on the date he executed the 2003 will. Accordingly, Kenneth's claim is meritless.

Next, Kenneth claims that the trial court erred in declaring the 2007 power of attorney procured by Kenneth from the Decedent to be void *ab initio*, as the question was not squarely before it or relevant to the disposition of any other pending issue. Kenneth asserts a violation of his due process rights. We agree.

After hearing evidence in the will contest, the trial court, apparently in the interest of judicial economy, concluded that it "need not hold a separate hearing to determine that the power of attorney document that [Decedent] executed by mark on July 16, 2007 is invalid." Trial Court Opinion, 9/30/10, at 28. Although the specific issue of the 2007 power of attorney's validity was not before the court, the court made a finding, *sua sponte*, that the Decedent did not possess the requisite capacity when he signed the document.[9] The trial court made a further finding that the power of attorney did not comply with the provisions of 20 Pa.C.S.A. § 5601 and, for that reason also, was invalid as a matter of law.

David raised the issue of the validity of the power of attorney in objections he filed to Kenneth's power of attorney accounting, which is still pending before the trial court. By order dated March 11, 2009, the trial court scheduled a three-day hearing on the specific issue of the will contest, to be held on July 13–15, 2009. By further order dated March 20, 2009, the court supplemented its March 11, 2009 order to provide that the previously scheduled hearing would also address the issue of David's removal as executor. At no time did the court advise the parties that the issue of the validity of the 2007 power of attorney would be addressed at the July hearing. In fact, in its September 30, 2010 order disposing of the will contest and petition to remove the executor (in which it also declared the 2007 power of attorney invalid), the trial court scheduled a status conference on the pending power of attorney accounts and objections thereto. *See* Trial Court Order, 9/30/10, at ¶ 10.

 "Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues." *In the Interest of M.B.*, 356 Pa.Super. 257, 514 A.2d 599, 601 (1986). "[W]hen the issue is first stated only in the court's resolution of it, the unsuspecting party has no opportunity during the proceedings to voice his objections or match his case to the altered issue." *Id.* Here, the trial court notified the parties of the specific issues to be addressed at the hearing. The issue of the validity of the 2007 power of attorney was not enumerated in either of the court's scheduling orders. As such,

9. Although we reverse the trial court's determination on procedural grounds, we note that the court arrived at its conclusion based, at least in part, on *Kenneth's own testimony* that the Decedent did not have the capacity to understand the significance of his actions in signing his mark to the power of attorney. Specifically, Kenneth testified as follows at trial:

> Q: Could [Decedent] understand the form and the significance of his act when he signed the power of attorney on July 16, 2007?
> A: He would know what the—
> Q: That's a yes or no question.
> A: No.

N.T. Trial, 3/24/08, at 355.

Kenneth was not on notice that the court would be adjudicating that issue based upon the evidence presented at the hearing and had no opportunity to prepare witnesses, documentation or legal argument. Thus, we conclude that the trial court erred in *sua sponte* ruling on the validity of the 2007 power of attorney without notice to Kenneth. Accordingly, the relevant portion of the September 30, 2010 order is hereby vacated and the issue remanded for resolution in due course at the hearing on objections to the power of attorney account. Upon remand, the trial court shall take all steps necessary to maintain the *status quo* with respect to all property which had been transferred by Kenneth using the power of attorney until such time as a final order on the objections is entered.

Kenneth's final claim is that the trial court erred in invoking the equitable doctrine of unclean hands "where a finding of unclean hands was not supported by the evidence and not germane to the disposition of any issue pending between the parties[.]" Brief of Appellant, at 5. Kenneth argues that it was improper for the court to apply the doctrine to "remote matters [ (i.e. power of attorney transactions occurring in 2005, 2006 and 2007) ] unrelated to the controversy in issue," i.e. the validity of the 2003 will. *Id.* at 49.

■■■■■■ In *Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984), our Supreme Court discussed at length the doctrine of unclean hands. The doctrine "is derived from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties." *Id.*

at 222 (quotations and citations omitted). The doctrine applies "where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy." *Id.* at 223. "[T]he application of the doctrine to deny relief is within the discretion of the chancellor, and in exercising his discretion the chancellor is free not to apply the doctrine if a consideration of the entire record convinces him that an inequitable result will be reached by applying it." *Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236, 245 (1976). The court may raise the doctrine of unclean hands *sua sponte. Id.* at n. 10.

■■■ Here, although the trial court invoked the doctrine of unclean hands and concluded that Kenneth's conduct was "egregious," it ultimately opted not to apply the doctrine to deny relief out of hand, acknowledging that Kenneth's wrongdoing "*might* be too remotely or indirectly connected" to the question of the validity of the 2003 will. Trial Court Opinion, 9/30/10, at 27 (emphasis in original). Instead, the court proceeded to decide the case on its merits. Thus, the court's finding of unclean hands amounted to little more than an observation regarding Kenneth's conduct. Kenneth was not barred from presenting his evidence at trial or fully prosecuting his appeal from probate and suffered no actual sanction as a result of the court's finding. Thus, to the extent that the court may have erred in invoking the doctrine (which the court itself acknowledges as a possibility), such error was harmless as the matter was ultimately decided on its merits and Kenneth suffered no actual prejudice.[10] *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756

10. Indeed, any prejudice Kenneth suffered was the result of his "evasive testimony and ... demeanor during the hearing," the court's observation of which actually formed the basis for its invocation of the doctrine in the first instance. *See* Trial Court Opinion, 9/30/10, at 25.

A.2d 1116 (2000) (trial court error harmless where party suffers no prejudice from mistake).

Order affirmed in part and reversed in part. Jurisdiction relinquished.