J-A35037-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF MARIA HIRNYK, Deceased, | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MARJORIE WEIBLINGER, | : | No. 376 WDA 2015 |

Appeal from the Order February 9, 2015
in the Court of Common Pleas of Allegheny County,
Orphans' Court Division, No. 02-12-7115

BEFORE: BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:             **FILED JANUARY 29, 2016**

Marjorie Weiblinger ("Weiblinger") appeals from the Order dismissing her Petition for Citation *Sur* Appeal from the Register of Wills, and admitting to probate the 2009 Will ("2009 Will") of decedent, Maria Hirnyk ("Hirnyk"). We affirm.

Hirnyk, a Ukrainian immigrant, was born on October 12, 1922. Hirnyk spoke broken English and had a limited ability to read and write English. Hirnyk also did not drive and required assistance with transportation, administering her medicine, organizing her bills, and corresponding in writing with her family. Hirnyk executed the 2009 Will, which named her daughter, Angella Piotrowski ("Piotrowski"), as the sole legatee.

In 2009, Weiblinger met Hirnyk at church. Weiblinger began to assist Hirnyk with her shopping needs approximately once or twice a week. In 2010, Weiblinger increased her assistance by helping Hirnyk with, *inter alia*,

her banking, transportation to doctors' appointments, paying bills, and writing checks. Thereafter, Hirnyk gave Weiblinger power of attorney.

In August 2011, Hirnyk revoked the power of attorney after accusing Weiblinger of theft, and alleging that Hirnyk signed the power of attorney while hospitalized with diminished capacity. As a result, Nadia Peternel ("Peternel"), a longtime family friend, began to assist Hirnyk with her daily needs including banking, driving, and household chores. In September 2011, Hirnyk gave Peternel power of attorney to act as Hirnyk's agent. In early 2012, Hirnyk's doctor, Dr. Dushan Majkic ("Dr. Majkic") noted that Hirnyk exhibited symptoms of forgetfulness, confusion, paranoia, and depression. Thereafter, Hirnyk, believing that Peternel was stealing from her, revoked Peternel's power of attorney.

Weiblinger resumed assisting Hirnyk with her needs. In March 2012, a joint bank account was opened, in Weiblinger and Hirnyk's names, with deposits totaling over $90,000. At Hirnyk's direction, Weiblinger contacted Attorney Carol Sikov Gross ("Attorney Gross"), a certified elder law attorney, to prepare legal documents for Hirnyk. On June 8, 2012, Hirnyk executed a will ("2012 Will") and a power of attorney naming Weiblinger as her agent. In the 2012 Will, Hirnyk excluded any bequest to Piotrowski, and indicated that Weiblinger would receive a substantial portion of Hirnyk's estate. Subsequently, Weiblinger removed Hirnyk from the joint bank account. Hirnyk died on October 31, 2012.

On November 29, 2012, the 2009 Will was admitted to probate and Piotrowski was granted letters testamentary. Weiblinger filed a Petition to Open Probate Record to Admit Later Will pursuant to 20 Pa.C.S.A. § 3138.[1] Hearing Officer Timothy Finnerty, Esquire ("Hearing Officer Finnerty") issued a citation to Piotrowski to demonstrate why the 2012 Will should not be admitted to probate. Piotrowski filed an Answer and New Matter, stating that Hirnyk lacked testamentary capacity to execute the 2012 Will and that Weiblinger exercised undue influence on Hirnyk. Following a hearing, Hearing Officer Finnerty issued an Order finding that Hirnyk had testamentary capacity, but that the 2012 Will was the product of undue influence.

Weiblinger appealed to the Court of Common Pleas of Allegheny County, Orphans' Court Division, by Petition for Citation *Sur* Appeal. The Honorable Lawrence J. O'Toole heard the case based upon the testimony taken by Hearing Officer Finnerty. Judge O'Toole found that Hirnyk had testamentary capacity to execute the 2012 Will, but that the 2012 Will was

---

[1] Section 3138 states the following:

> If a later will or codicil is submitted to the register for probate within three months of the testator's death but after the register shall have probated an earlier instrument, the register, after such notice as he deems advisable, but with at least ten-days' notice to the petitioner who presented the probated instrument if he has not requested probate of the later will or codicil, shall have power to open the probate record, receive proof of the later instrument or instruments and amend his probate record.

20 Pa.C.S.A. § 3138.

the product of undue influence. Judge O'Toole thus dismissed Weiblinger's appeal and directed that Hirnyk's estate proceed under the 2009 Will. Weiblinger filed a timely Notice of Appeal.

On appeal, Weiblinger raises the following questions for our review:

1. May [the Orphans' Court] base a finding of weakened intellect and undue influence on a relationship of friendship and cooperative assistance between a testatrix and her friend and eventual agent?

2. May [the Orphans' Court] conclude that the contestant of a will has shown clear and convincing evidence of a testatrix's weakened intellect and a proponent's confidential relationship when the contestant has offered direct, uncontradicted evidence in her case in chief that both disputes and disproves those two conditions?

3. May [the Orphans' Court] admit police records into evidence for the truth of the statements asserted therein where a hearsay exception is claimed for the admissibility of the reports, but not the content of the reports regarding observations and speculations as to the testatrix's mental state?

4. May [the Orphans' Court] rely on medical testimony of a treating physician who had no real personal contact with the testatrix and who was not qualified by training or experience to offer an expert opinion on weakened intellect or testamentary capacity?

Brief for Appellant at 4.

Our standard of review is as follows:

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [Orphans' Court's] findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support

the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Nalaschi*, 90 A.3d 8, 11 (Pa. Super. 2014) (citation omitted).

We will address Weiblinger's first two claims together. Weiblinger contends that the Orphans' Court erred in finding that the 2012 Will was the product of undue influence. Brief for Appellant at 19-23, 27. Weiblinger argues that she did not have a confidential relationship with Hirnyk, as Weiblinger only provided assistance for day-to-day activities, including shopping, check writing, and companionship. *Id*. at 19. Weiblinger points to Peternel's testimony that Hirnyk maintained a guarded relationship with her and that Hirnyk did not trust Weiblinger with all of her healthcare and financial information. *Id*. at 21-23, 24. Weiblinger argues that Hirnyk did not have a weakened intellect and that Hirnyk was a strong-willed and independent woman who knew her family and paid attention to her finances. *Id*. at 23, 24-27. Weiblinger further asserts that Hirnyk assigned power of attorney to her only after the execution of the 2012 Will, which demonstrated that Hirnyk settled the estate plans without Weiblinger's knowledge. *Id*. at 21, 22, 23. Weiblinger maintains that she never spoke with Attorney Gross about the 2012 Will or reviewed the 2012 Will prior to its execution. *Id*. at 26-27. Weiblinger claims that the power of attorney does not raise an inference of a confidential relationship because Hirnyk continually provided different agents with power of attorney to manage her

- 5 -

affairs. *Id*. at 21. Weiblinger also argues that there was no evidence or allegations of improper conduct surrounding the execution of the 2012 Will. *Id*. at 23.

"Any person 18 or more years of age who is of sound mind may make a will." 20 Pa.C.S.A. § 2501. "In making a will, an individual may leave his or her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." *In re Estate of Nalaschi*, 90 A.3d at 11 (citation and quotation marks omitted). Undue influence is a "subtle, intangible and illusive thing, generally accomplished by a gradual, progressive inculcation of a receptive mind." *In re Estate of Fritts*, 906 A.2d 601, 607 (Pa. Super. 2006). To prove undue influence, the contestant must establish

> (1) the testator suffered from a weakened intellect at the time the will was executed; (2) there was a person in a confidential relationship with the testator; and (3) the person in the confidential relationship received a substantial benefit under the challenged will.

*In re Estate of Nalaschi*, 90 A.3d at 14; *see also In re Estate of Fritts*, 906 A.2d at 607 (stating that "[c]onduct constituting influence must consist of imprisonment of the body or mind, or fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator," which destroys the testator's free agency in making a will). "Once these

three elements are established by the contestant, the burden shifts back to the proponent to prove the absence of undue influence by clear and convincing evidence." **In re Bosley**, 26 A.3d 1104, 1108 (Pa. Super. 2011).

With respect to "weakened intellect," this Court has observed the following:

> Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. In a case of undue influence, a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date that the contested will was executed. However, if the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. Our review of the court's factual findings is limited to considering whether those findings have support in the record.

**In re Estate of Fritts**, 906 A.2d at 607 (citations, brackets and quotation marks omitted).

Here, Dr. Majkic, who had treated Hirnyk since 2002 or 2003, testified that beginning in January 2012, Hirnyk suffered from chronic health problems, including diabetes, high blood pressure, atrial fibrillation, congestive heart failure, coronary artery disease, multiple strokes, and peripheral vascular disease. N.T., 11/12/13, at 15, 17, 18-19. Dr. Majkic also diagnosed Hirnyk as suffering from dementia in March 2012. **Id**. at 22-23, 26, 34, 37, 39; **see also id**. at 21-22, 26, 28 (stating that Hirnyk suffered from forgetfulness, confusion, paranoia, depression, and anxiety). Dr. Majkic further stated that in May 2012, Hirnyk was suffering from visual

and auditory hallucinations. *Id*. at 31-32. Dr. Majkic opined that Hirnyk suffered from dementia, to a reasonable degree of medical certainty, in June 2012. *Id*. at 44.

Additionally, Peternel described Hirnyk as confused, agitated, disoriented, and aggravated, and stated that she was incapable of living alone. N.T., 11/21/13, at 49, 66. Father Yaroslav Koval, a Ukrainian Catholic priest, who visited with Hirnyk on a monthly basis beginning in November 2011, stated that Hirnyk was often confused and frequently retold stories from her past. *Id*. at 106-07, 108-10. Detective Anthony Cortazzo ("Detective Cortazzo") testified that he had four to six interactions with Hirynk arising out of theft allegations. N.T., 11/19/13, at 39-40, 43-45. Detective Cortazzo stated that Hirnyk was confused and constantly changed her story about the alleged perpetrators. *Id*. at 43.

The above evidence is sufficient to sustain the Orphans' Court's finding that Hirynk had a weakened intellect at the time the 2012 Will was executed. *See* Orphans' Court Opinion, 2/10/15, at 5 (unnumbered); *see also In re Estate of Fritts*, 906 A.2d at 607.

With regard to a confidential relationship, our Court has stated the following:

> A confidential relationship exists whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other. … Although no precise formula has been devised to ascertain the

existence of a confidential relationship, it has been said that such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest. Further, the existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the parties. In fact, no clearer indication of a confidential relationship can exist than giving another person the power of attorney over one's entire life's savings. This is particularly true when the alleged donee is shown to have spent a great deal of time with the decedent or assisted in decedent's care.

*Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. 1995) (citations, brackets, quotation marks and paragraph break omitted).

The Orphans' Court found a confidential relationship based upon the following:

First, [Hirnyk] relied on [] Weiblinger for many of her daily needs, including check writing, bill paying, and transportation, which resulted in [] Weiblinger having intimate details as to [Hirnyk's] finances. Second, [Hirnyk] obviously trusted [] Weiblinger because she allowed her to assist with normally confidential banking matters, which [Hirnyk] could not handle on her own. Third, it was [] Weiblinger who made the initial contact with Attorney Gross's office regarding the preparation of the [2012] Will and Power of Attorney. Fourth, after Attorney Gross met with [Hirnyk] to discuss the contents of the documents on May 17, 2012, all future contacts with counsel's office, including arranging the June 8, 2012 date to execute the documents, were done by [] Weiblinger. Fifth, contrary to the testimony of all other witnesses, [] Weiblinger, rather incredibly, maintained that [Hirnyk] could read and write English. Sixth, [] Weiblinger claimed that she did not seek the letter barring [] Peternel from visiting [Hirnyk], which was contrary to the testimony of Attorney Gross.[2]

---

[2] In August 2012, Peternel visited Hirnyk to inform her that money was missing from Hirnyk's bank accounts. N.T., 11/21/13, at 53-54. Thereafter, Weiblinger called Peternel stating the following: "Look bitch, I'll make sure

Orphans' Court Opinion, 2/10/15, at 6 (unnumbered) (footnote added).

The Orphans' Court's determination is supported by the record. *See id*.; *Estate of Lakatosh*, 656 A.2d at 1383. Indeed, while Weiblinger was granted power of attorney on the same day that the 2012 Will was executed, Weiblinger managed or controlled Hirnyk's affairs, and Weiblinger heavily influenced Hirnyk. *See In re Estate of Fritts*, 906 A.2d at 608 (finding a confidential relationship "where the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed.") (citation omitted); *see also Estate of Gilbert*, 492 A.2d 401, 404-05 (Pa. Super. 1985) (holding that while appellant was granted power of attorney over father after property transfers had already occurred, the evidence established a confidential relationship where father's weakened intellect, coupled with daughter's influence borne of her position of confidence, had destroyed father's capacity to dispose freely and independently of his assets). Thus, Weiblinger and Hirnyk had a confidential relationship.

Finally, Weiblinger received a substantial benefit under the 2012 Will, as Hirnyk "left all of her personal property, along with her residuary estate to [] Weiblinger." Orphans' Court Opinion, 2/10/15, at 7 (unnumbered);

---

you never see her alive again." *Id*. at 56. Weiblinger then contacted Attorney Gross, requesting a letter barring Peternel from visiting Hirnyk. N.T., 11/25/13, at 254.

*see also In re Clark's Estate*, 334 A.2d 628, 633 (Pa. 1975) (holding that a substantial benefit occurred where proponent received approximately 70% of the estate); *Estate of Lakatosh*, 656 A.2d at 1383-84 (holding that proponent, who received all but $1,000 of estate, was deemed to have received a "substantial benefit").

Based upon the foregoing, sufficient evidence exists to find that Hirynk suffered from a weakened intellect, there was a confidential relationship between Hirynk and Weiblinger, and Weiblinger received a substantial benefit from the 2012 Will. *See Estate of Lakatosh*, 656 A.2d at 1385. Thus, Piotrowski presented clear and convincing evidence that Weiblinger exercised undue influence over Hirnyk. Moreover, Weiblinger failed to disprove that the 2012 Will was the product of undue influence. *See id*.; *see also In re Bosley*, 26 A.3d at 1108. Indeed, Weiblinger's argument rests solely on this Court re-weighing the evidence and making credibility determinations in her favor. *See In re Estate of Presutti*, 783 A.2d 803, 805 (Pa. Super. 2001) (stating that "the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion."); *see also In re Estate of Nalaschi*, 90 A.3d 8, 11. Accordingly, the Orphans' Court did not abuse its discretion or err as a matter of law in finding that the 2012 Will was a product of undue influence.

In her third claim, Weiblinger contends that the Orphans' Court erred in admitting police incident reports[3] because they constitute inadmissible hearsay. Brief for Appellant at 28. Weiblinger claims that the reports are not admissible under the hearsay exception at Pa.R.E. 803(6), Records of a Regularly Conducted Activity, or the Uniform Business Records as Evidence Act, as the reports were not properly authenticated. *Id*. at 29.

> Our standard of review for the admission of evidence is as follows:
>
> [W]hen we review a ruling on the admission or exclusion of evidence, … our standard is well-established and very narrow. These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, [t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Jacobs v. Chatwani*, 922 A.2d 950, 960 (Pa. Super. 2007) (citation omitted).

"Hearsay is defined as an extra judicial declaration offered to prove the truth of the matter asserted." *Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.*, 77 A.3d 1, 12-13 (Pa. Super. 2013); *see also* Pa.R.E. 801(c). "A document itself qualifies as hearsay when it contains such hearsay statements." *Keystone Dedicated Logistics, LLC*, 77 A.3d at 12.

---

[3] The reports, taken between August 2011 and March 2012, document complaints made by Hirnyk to the Baldwin Borough Police Department, including that someone was leaving something in her shoe, and that men in white lab coats were watching her sleep.

"Anything qualifying as hearsay is inadmissible as evidence unless an exception applies." *Id*.; *see also* Pa.R.E. 802.

One such exception is contained in Pa.R.E. 803(6), which states the following:

> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,
>
> (A)    the record was made at or near the time by--or from information transmitted by--someone with knowledge;
> (B)    the record was kept in the course of a regularly conducted activity of a "business," which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
> (C)    making the record was a regular practice of that activity;
> (D)    all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E)    neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6).

> Furthermore, the Uniform Business Records as Evidence Act states:
>
> A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S.A. § 6108(b).

"It is not essential under the Uniform Business Records as Evidence Act to produce either the person who made the entries or the custodian of

the record at the time the entries were made." ***Boyle v. Steiman***, 631 A.2d 1025, 1032 (Pa. Super. 1993); ***see also In re Indyk's Estate***, 413 A.2d 371, 373 (Pa. 1979) (stating that "[w]here it can be shown that the entries were made with sufficient contemporaneousness to assure accuracy and that they were made pursuant to the business practices and not influenced by the litigation in which they are being introduced, a sufficient indicia of reliability is provided to overcome their hearsay nature.") (footnote omitted). "Moreover, the law does not require that a witness qualifying business records even have a personal knowledge of the facts reported in the business record." ***Boyle***, 631 A.2d at 1032. "As long as the authenticating witness can provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness for the business records of a company, a sufficient basis is provided to offset the hearsay character of the evidence." ***U.S. Bank, N.A. v. Pautenis***, 118 A.3d 386, 401 (Pa. Super. 2015).

Here, Detective Cortazzo testified that he had been a detective with the Baldwin Borough Police Department since approximately 2003. N.T., 11/19/13, at 7. Detective Cortazzo stated that he takes various reports and information from patrol officers and coordinates an investigation. ***Id***. As part of the investigation, Detective Cortazzo reviews and is familiar with the police incident reports. ***Id***. at 7-8, 9. Detective Cortazzo stated that the reports are generated and maintained in the regular course of business. ***Id***.

at 8, 9-10. Detective Cortazzo indicated that the officer generates the incident report on a computer near the time of the events in question. *Id*. at 8, 11. The incident report will include the type of call alerting the police officers of the incident, the time and date of the call, the location, any interested parties, and a short narrative describing the incident in question. *Id*. at 10. Detective Cortazzo testified that the police generated and maintained the reports, entered into evidence relating to Hirnyk, in the regular course of business. *Id*. at 10, 11.

Detective Cortazzo's testimony was sufficient to establish the reliability and admission of the police reports. *See Boyle*, 631 A.2d at 1033 (stating that testimony indicating that the records were made in the regular course of business, the entries in the records were made at or near the time information became available, and the records required accurate entries, was sufficient to establish a proper foundation for the admission of the records); *Commonwealth v. Corradino*, 588 A.2d 936, 939 (Pa. Super. 1991) (concluding that testimony from state trooper detailing the printouts from the National Crime Information Center, how the printouts were made, how they were obtained, and the mode of preparation was sufficient to demonstrate the reliability of the printouts under the Uniform Business

Records as Evidence Act). Thus, Weiblinger's claim in this regard is without merit.[4]

Moreover, Weiblinger baldly asserts that the reports contain statements made by persons to the reporting police officer, which would only be admissible if they conform to a hearsay exception. Brief for Appellant at 29. However, Weiblinger presents only a single sentence to support this assertion and fails to cite to the reports or any specific statements that were erroneously admitted.

It is well-established that parties must include in their briefs "such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). Thus, Weiblinger's failure to develop an argument or include citation to relevant authority results in the waiver of this argument. *See Estate of Lakatosh*, 656 A.2d at 1381 (declining to address issues where the brief contained only general statements and did not contain any citation

---

[4] Weiblinger argues that the police reports must be certified under the requirements of Pa.R.E. 902(11) prior to admitting the reports under Rule 803(6). Brief for Appellant at 29. However, under the plain language of Rule 803(6), the conditions of authentication may be shown "by the testimony of the custodian or another qualified witness, **or** by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification[.]" Pa.R.E. 803(6)(D) (emphasis added). As noted above, Detective Cortazzo's testimony authenticated the reports.

to relevant authority).[5]   Based upon the foregoing, we conclude that Weiblinger's third claim is without merit.

In her fourth claim, Weiblinger contends that the Orphans' Court erred in admitting the expert opinion testimony of Dr. Majkic.  Brief for Appellant at 29-30.  Weiblinger argues that Dr. Majkic lacked the background and qualifications to testify as an expert on the "weakened intellect component of an undue influence claim."  *Id*. at 32.  Weiblinger asserts that Dr. Majkic did not have a clear understanding of the definition of weakened intellect. *Id*.  Weiblinger additionally claims that Dr. Majkic's opinion that Hirnyk "suffered from advanced dementia was beyond the scope of his report." *Id*.; *see also id*. at 33 (wherein Weiblinger argues that there is no mention in Dr. Majkic's report or any other exhibits of the diagnosis of "advanced" dementia).  Weiblinger contends that while Dr. Majkic's report included a diagnosis of dementia, his testimony of advanced dementia improperly influenced the Orphans' Court's finding that Hirnyk suffered from a weakened intellect.  *Id*. at 33.

---

[5] Weiblinger also argues that the reports are not admissible under the official records exception to the hearsay rule.  Brief for Appellant at 28-29. However, as noted above, the Orphans' Court properly admitted the incident reports under the business records exception.  **See** Order, 1/9/15. Moreover, Weiblinger's reliance upon Commonwealth Court cases is unavailing in this case.  **See Beaston v. Ebersole**, 986 A.2d 876, 881 (Pa. Super. 2009) (noting that "that decisions rendered by the Commonwealth Court are not binding on this Court.").

"Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." ***Kovalev v. Sowell***, 839 A.2d 359, 362 (Pa. Super. 2003) (citation omitted).

> It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. It is to ascertain whether the proposed witness has sufficient skill, knowledge, or experience in the field at issue as to make it appear that the opinion or inference offered will probably aid the trier of fact in the search for truth.

***George v. Ellis***, 820 A.2d 815, 817 (Pa. Super. 2003) (citations omitted).

Here, Dr. Majkic testified that he is a general adult internal medicine physician and is licensed and certified to practice medicine in Pennsylvania. N.T., 11/12/13, at 5-7. Dr. Majkic indicated that he graduated from New York Medical College in 1993 and worked as an internist since 1996. ***Id***. at 5-6. Dr. Majkic stated that in his practice, he has treated several thousand elderly patients, including patients suffering from dementia. ***Id***. at 9. Further, Dr. Majkic indicated that he had treated Hirnyk since 2002 or 2003 and that he diagnosed her with dementia after seeing her approximately once a month in 2012. ***Id***. at 15, 18, 21. Based upon our review of the record, Dr. Majkic was qualified to testify as an expert in this case.

With regard to Weiblinger's claim that Dr. Majkic testified outside the scope of his expert report, we note the following:

> In determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must

determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness.

In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

*Feden v. Consol. Rail Corp.*, 746 A.2d 1158, 1162 (Pa. Super. 2000) (citations, brackets, emphasis, and quotation marks omitted); *see also* Pa.R.C.P. 4003.5.

Dr. Majkic's pre-trial report indicated that Hirnyk suffered from "dementia." On direct examination, Dr. Majkic testified that he diagnosed Hirnyk with dementia in March 2012. N.T., 11/12/13, at 22-23. On cross-examination, in response to a question as to the cause of Hirnyk's altered mental condition, Dr. Majkic described Hirnyk's condition as "advanced dementia" and "vascular dementia." *Id*. at 63.

Initially, Dr. Majkic's testimony that purportedly fell outside the scope of the pre-trial report was elicited on cross-examination. *See* Pa.R.C.P. 4003.5(c) (stating that "the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto."). In any event, we conclude that the enlargement of Dr. Majkic's written words falls within the

coverage of "fair scope," as the testimony was not of a nature to prevent Weiblinger "from making a meaningful response, or which would mislead [Weiblinger] as to the nature of the appropriate response." ***Feden***, 746 A.2d at 1162. Indeed, both diagnoses state that Hirnyk suffered from dementia. ***See id***. (stating that "[s]o long as the theory to which both diagnoses relate was disclosed in the original report, no further elucidation is necessary."); ***Hickman v. Fruehauf Corp.***, 563 A.2d 155, 157 (Pa. Super. 1989) (stating that "'[f]air scope' contemplates a reasonable explanation and even an enlargement of the expert's written words.") (citation omitted). In point of fact, Weiblinger does not indicate that she was surprised by Dr. Majkic's testimony, as the underlying dispute of the case was whether Hirnyk suffered from a weakened intellect at the time the 2012 Will was executed. ***See Feden***, 746 A.2d at 1162. Because Dr. Majkic's testimony regarding his diagnosis of dementia constituted a reasonable explanation of his report, the testimony was not outside the fair scope of the report. ***See id***. (concluding that a pre-trial report stating appellant suffered from post-traumatic stress disorder traits and testimony that indicating appellant suffered from post-traumatic stress disorder only differed in scientific parlance and the testimony was not outside the scope of the report); ***see also Oxford Presbyterian Church v. Weil-McLain Co.***, 815 A.2d 1094, 1100 (Pa. Super. 2003) (ruling that an expert was permitted to "flesh out" his reports with some mathematical calculations and sketches to aid the jury

in understanding why he believed it was impossible for the fire to have started in the manner alleged).

Weiblinger additionally raises arguments relating to Dr. Majkic's credibility and the weight given to his testimony regarding Hirnyk's mental capacity. However, as noted above, we will not re-weigh the testimony or make credibility determinations. *See In re Estate of Presutti*, 783 A.2d at 805. Based upon the foregoing, we conclude that Weiblinger's fourth claim is without merit.

Finally, Weiblinger argues that the Orphans' Court improperly admitted evidence of financial transactions on accounts involving Weiblinger and Hirnyk, conducted after the execution of the 2012 Will. Brief for Appellant at 34. Weiblinger asserts that the transactions were not relevant or material to determine whether the 2012 Will had been procured by undue influence. *Id*. at 34-35.

Weiblinger did not set forth or suggest this issue in her Statement of Questions Involved in her brief. Thus, Weiblinger's argument is waived on appeal. *See* Pa.R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); *see also Krebs v. United Ref. Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that "[w]e will

not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved….").[6]

Order affirmed.

Judgment Entered.

_(signature)_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/29/2016

---

[6] Even if we addressed Weiblinger's argument, we would deem it without merit. "[I]t is well recognized that testamentary capacity is to be determined by the condition of the testat[or] at the very time [she] executes the will." *In re Estate of Vanoni*, 798 A.2d 203, 210 (Pa. Super. 2002) (citation omitted). However,

> [u]ndue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The 'fruits' of the undue influence may not appear **until long after the weakened intellect has been played upon**. In other words, the particular mental condition of the [testator] on the date [she] executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity.

*In re Bosley*, 26 A.3d at 1112 (citation omitted, emphasis added). Here, the Orphans' Court properly admitted the evidence of the financial transactions as they provided evidence of the confidential relationship between Weiblinger and Hirnyk. *See id*.