J-S21043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.S.T.C., A/K/A K.W., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.W. | : | No. 1790 WDA 2016 |

Appeal from the Order October 27, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000003-2016

BEFORE:   LAZARUS, DUBOW, and STRASSBURGER[*], JJ.

MEMORANDUM BY STRASSBURGER, J.:                **FILED MAY 03, 2017**

B.W. (Mother) appeals from the order entered October 27, 2016, in the Court of Common Pleas of Allegheny County, which terminated involuntarily her parental rights to her minor daughter, K.S.T.C. a/k/a K.W. (Child), born in September 2010.[1]  We affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> [Child] entered the care of the Allegheny County Office of Children Youth and Families ("CYF") when the agency obtained an Emergency Custody Authorization on June 9, 2014.  [Child] was three years old at the time, and the agency had been

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The order also terminated the parental rights of Child's putative father, D.M., and the parental rights of any unknown father that Child may have. Neither D.M., nor any unknown father, filed an appeal from the termination of his parental rights.

working with Mother.  [] Mother failed to complete a drug and alcohol assessment, and there were further concerns that she was leaving her children, including [Child], with inappropriate caregivers.  Mother was also facing eviction from transitional housing for only having attended one of the mandatory weekly meetings in seven months.  Her housing supervisor discovered empty [bottles of] wine coolers and garbage and feces throughout the home.  [Child] was removed from Mother's care and placed in the care of a family member.  It was determined that Mother was homeless and had not achieved sobriety.  Mother stipulated to [Child's] dependency in July 2014.  Mother's goals were to attend a dual diagnosis treatment program, obtain safe and appropriate housing, to participate in a parenting skills program, and to attend drug screens.

[Child] was initially placed with a family friend, T.M., for approximately six weeks until the end of July 2014.  [Child] was placed with a second family friend, S.J., from July 2014 until October 2014.  [Child] was then placed with T.C., her pre-adoptive foster mother, who is the paternal aunt of [Child's half-siblings].  [Child] lived with her half-siblings in this home for some time, but as of June 2016, [Child's half-siblings] no longer reside there.[2]

Meanwhile, Mother struggled to make progress on any [of] her goals.  She admitted to mental health issues, including depression, bipolar personality disorder and issues with anger management, but would not seek treatment.  She had been unable to maintain stable housing.  Communication and cooperation with CYF has been extremely difficult.  She has admitted to charges of possession of a stolen car, and more recently, burglary and driving under the influence.  Mother attended only nine of 37 drug screens; the last she attended was in January 2016.  Her visits with [Child] have also been inconsistent, sometimes no[t] showing despite confirming that she would attend…. Mother did not have her own housing….

---

[2] Child's half-siblings are currently in the custody of their father.  N.T., 9/21/2016, at 19.

Orphans' Court Opinion, 12/28/2016, at 1-2 (citation to the record, unnecessary capitalization, and footnote omitted).

On January 19, 2016, CYF filed a petition to terminate involuntarily Mother's parental rights to Child. CYF filed an amended petition on March 18, 2016. The orphans' court conducted a termination hearing on September 21, 2016. Following the hearing, on October 27, 2016, the court entered an order terminating Mother's parental rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal.

Mother raises the following question for our review. "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that termination of Mother's parental rights would serve the needs and welfare of the Child pursuant to 23 Pa.C.S. §[]2511(b)?" Mother's Brief at 5.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often

have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). On appeal, Mother concedes that CYF presented clear and convincing evidence that her parental rights should be terminated pursuant to Section 2511(a). Mother's Brief at 10 ("CYF, the petitioner, did clearly and convincingly establish threshold grounds for termination pursuant to 23 Pa.C.S. §[]2511(a)(2)."). As our Supreme Court recently explained, "[I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the

- 4 -

developmental, physical and emotional needs and welfare of the child' [as outlined in 23 Pa.C.S. § 2511(b)]." ***In re T.S.M.,*** 71 A.3d 251, 267 (Pa. 2013). Thus, we need only consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). That subsection provides as follows.

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(2), (5), (8), and (b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether

> any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, Mother argues that terminating her parental rights would be contrary to Child's needs and welfare. Mother emphasizes the testimony of psychologist, Neil Rosenblum, Ph.D., who conducted an interactional evaluation of Child and Mother, and opined that they share a strong and healthy bond. Mother's Brief at 12. Mother further emphasizes Dr. Rosenblum's testimony that terminating her parental rights would cause emotional harm to Child. *Id.* Mother contends that the orphans' court discounted this testimony and instead based its conclusions on Mother's parental incapacity, in contravention of the well-settled principle that section 2511(b) focuses on the welfare of the child and not the fault of the parent. *Id.* at 12-13 (citing *In re R.L.T.M.*, 860 A.2d 190, 193 (Pa. Super. 2004)).

In its opinion, the orphans' court acknowledged that terminating Mother's parental rights may result in Child's no longer having contact with Mother, and that Child "could be somewhat negatively affected" if her relationship with Mother is ended. Orphans' Court Opinion, 12/28/2016, at 5. The court further acknowledged that Dr. Rosenblum recommended placing Child in subsidized permanent legal custodianship (SPLC) rather than

terminating Mother's parental rights.[3]  *Id.* at 4-6.  However, the court concluded that the permanency and stability provided by adoption would significantly outweigh any potential harm to Child, and rejected Dr. Rosenblum's recommendation.  *Id.* at 5.  The court stressed that Mother has failed to address her mental health issues, and that it is unlikely that Mother will ever address those issues.  *Id.* at 4-6.  In addition, the court stressed that Child has been in foster care for over two years, that Mother has failed to visit with Child consistently, and that Child views her foster mother, T.C., as her caretaker and provider.  *Id.* at 5-6.  The court concluded that Child's bond with Mother is not necessary and beneficial, and that only T.C. has met Child's developmental, physical, and emotional needs and welfare.  *Id.*  We agree.

_____

[3] This Court has explained SPLC as follows.

> In 2001, Pennsylvania created a subsidy program, SPLC, which provides financial support for families willing to become permanent legal custodians pursuant to [42 Pa.C.S. § 6351(f.1)(3)].  SPLC transfers permanent legal custody to the depend[e]nt child's legal custodian without requiring the termination of natural parental rights.  When deemed appropriate, the trial court has the power to permit continued visitation by the depend[e]nt child's natural parents.  To be eligible for SPLC, the legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

*In re B.S.*, 861 A.2d 974, 977 (Pa. Super. 2004).

As this Court has explained, "a trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented." *In re Bosley*, 26 A.3d 1104, 1111 (Pa. Super. 2011) (citing *Childress v. Bogosian,* 12 A.3d 448, 456 (Pa. Super. 2011)). Courts are empowered to reject the testimony of an expert witness, even when that testimony is uncontested, so long as the court's decision is supported by competent evidence of record. *M.A.T. v. G.S.T.*, 989 A.2d 11, 20 (Pa. Super. 2011) (citing *Nomland v. Nomland*, 813 A.2d 850, 854 (Pa. Super. 2002)).

In this case, the record amply supports the decision of the orphans' court to reject Dr. Rosenblum's recommendation for SPLC, and to terminate Mother's parental rights. During the termination hearing, the court heard the testimony of CYF caseworker, Michele Allen, who testified that Child does not display a strong attachment to Mother, and that terminating Mother's parental rights would serve Child's needs and welfare. N.T., 9/21/2016, at 64. Ms. Allen explained that Mother was initially offered supervised visits with Child twice per week. *Id.* at 51. However, Mother's visits were reduced to once per week in March 2016, due to Mother's inconsistent attendance.[4] *Id.* Ms. Allen testified that while Child initially displayed an

---

[4] For example, according to a permanency review order dated July 25, 2016, Mother scheduled seven visits with Child in March 2016, but attended only four. Mother scheduled three visits in April 2016 but attended only one. Mother scheduled three visits in May 2016 and attended only two. Finally, *(Footnote Continued Next Page)*

interest in visiting with Mother, "it got to the point where it didn't matter anymore." *Id.* at 64. Child will say that she misses her Mother if someone asks her, but Child does not bring up Mother on her own. *Id.* at 58, 64. Despite Mother's lack of contact, Ms. Allen stated that Child "seems very, very happy and content." *Id.* at 58. When Ms. Allen visits Child in her pre-adoptive foster home, Child is happy, pleasant, polite, and "a little bit more active. She is not as tentative as she was in the beginning." *Id.* at 57.

As discussed above, the orphans' court also heard the testimony of Dr. Rosenblum. Dr. Rosenblum testified that Child and Mother displayed an extremely close relationship during their interactional evaluation, and that terminating Mother's parental rights would cause emotional harm to Child. *Id.* at 176, 181. Dr. Rosenblum explained that he reached this conclusion based on Mother's strong parenting skills, which enabled Mother to "encourage [Child's] confidence and make her feel good about herself[.]" *Id.* at 176-77. When asked to describe Child's behaviors toward Mother, Dr. Rosenblum stated as follows.

> [Child] was very responsive to the attention that her mother gave her. I could see . . . a little bit of confidence shown [and] a little bit more of a willingness or ability to express herself due to [M]other's ability to bring that out in her.

_____
(Footnote Continued)

Mother scheduled one visit in June 2016 and one visit in July 2016, but did not attend either. *See* CYF Exhibit 1 (permanency review order dated July 25, 2016).

> So I felt that [Child] really enjoyed the opportunity to see [Mother] and spend time with her. You could observe a very positive connection between the two. She smiles at times and was pleased to have this opportunity to see [Mother].

*Id.* at 178.

However, on cross-examination, Dr. Rosenblum admitted that Child displayed little actual enthusiasm for Mother during the evaluation. Child did not display any emotional reaction to the activities that Mother attempted to engage her in, or at least "[n]ot as much as might have been expected." *Id.* at 198. Child was "fairly low key and lacked spontaneity," during the evaluation, and she struggled to maintain focus. *Id.* When asked how he could testify that Child was "very responsive" to Mother, given his admission that Child displayed little emotional reaction, Dr. Rosenblum stated as follows.

> She did well with the tasks, you know, based on Mother's help, you know. I would agree absolutely with the fact that she remained less emotionally spontaneous and less expressive in her aspect than the average child.
>
> She was hesitant about responding at times, but I felt that she responded to Mother's efforts as best that she could and that [M]other's interaction with her was extremely helpful in making the activities as productive as they were.

*Id.* at 199.

Despite his conclusion that Child and Mother share a close relationship, Dr. Rosenblum did not recommend frequent visits. Dr. Rosenblum noted that Mother attends her visits with Child only rarely, and that, "I think that [M]other admitted that she hadn't seen [Child] for months." *Id.* at 176. Dr.

Rosenblum explained, "I don't want to set [Child] up for an expectation that she is going to see [Mother] and [M]other doesn't appear[.]" *Id.* at 183. As a result, Dr. Rosenblum recommended that Mother be offered visits with Child "once a month or even less[.]" *Id.* Dr. Rosenblum suggested that Mother's visits with Child should be supervised, and could take place at a therapist's office.[5] *Id.* at 202.

Thus, the record supports the conclusion of the orphans' court that Child's bond with Mother is not necessary and beneficial. The evidence presented during the termination hearing establishes that Child sees Mother very rarely as it is, and that Child appears to be doing quite well despite Mother's absence from her life. Child does not mention Mother unless asked and is content in her pre-adoptive foster home. While Dr. Rosenblum opined that Child shares a close relationship with Mother, his testimony on this

---

[5] Dr. Rosenblum provided several other reasons for his recommendation that Child should be placed in SPLC, all of which stemmed from his belief that Child would suffer emotional harm if her relationship with Mother is ended. Specifically, Dr. Rosenblum expressed concern that Mother and Child's foster mother, T.C., do not have a good relationship, and that T.C. may prevent Child from seeing Mother if Mother's parental rights are terminated. N.T., 9/21/2016, at 180. Dr. Rosenblum also expressed concern that Child does not have a known father, and that the termination of Mother's parental rights would make her "a double loser or would be two strikes against her, so to speak." *Id.* Finally, Dr. Rosenblum observed that Child maintains a relationship with her two half-siblings. *Id.* at 179. Dr. Rosenblum explained that Child would be placed "in a very unfortunate and potentially stressful and traumatic position" if her half-siblings are able to maintain contact with Mother while she is not. *Id.* at 207. Dr. Rosenblum acknowledged that Child's half-siblings do not currently visit with Mother. *Id.* at 190.

issue was inconsistent and focused primarily on the strength of Mother's parenting skills.

Even assuming that Child and Mother do share a significant bond, preserving Mother's parental rights could merely prolong the emotional harm suffered by Child. As Dr. Rosenblum admitted, Child could experience emotional harm in the form of disappointment due to Mother's failure to attend visits. By terminating Mother's parental rights now, the orphans' court has ensured that Child will receive the greatest degree of permanence and stability possible, while protecting Child from this potential distress and uncertainty. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Finally, we reject Mother's assertion that the orphans' court placed an undue emphasis on her failings as a parent. Mother is correct that Section 2511(b) focuses on the welfare of Child, and not Mother's parental incapacity. However, it is beyond cavil that Mother's incapacity, and the likelihood that she will never remedy that incapacity, is an important consideration when determining what is best for Child. *See C.D.R.*, 111 A.3d at 1220 (citing *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003)) ("Clearly, it would not be in Child's best interest for his life to

remain on hold indefinitely in hopes that Mother will one day be able to act as his parent.").

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child. We therefore affirm the court's October 27, 2016 order.

Order affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2017