J-A04009-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: N.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: B.C.C.Y.S. AND GAL | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1201 MDA 2022 |

Appeal from the Order Entered August 12, 2022
In the Court of Common Pleas of Berks County
Juvenile Division at No:  CP-06-DP-0000010-2022

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY STABILE, J.:                    **FILED: MAY 8, 2023**

Appellants, Berks County Children and Youth Services and Ashley E. Esposito, Guardian Ad Litem ("GAL") (collectively "BCCYS"), appeal from an order denying Appellants' petition to adjudicate N.D., a minor ("Child"), dependent.  The court determined that BCCYS failed to provide clear and convincing evidence that N.D. was without proper parental care or control necessary for his physical, emotional or mental health and morals.  We affirm.

Child was born in December 2019.  On December 26, 2021, Child was hospitalized and required several emergency surgeries to remove 117 centimeters of necrotic bowels.  He remained hospitalized throughout January 2022.

On January 12, 2022, BCCYS filed a petition to adjudicate Child dependent under 42 Pa.C.S.A. § 6302(1).  On February 2, 2022, BCCYS filed an amended petition making additional allegations of abuse under 23

Pa.C.S.A. § 6303. In essence, BCCYS alleged that Child's parents ("Parents") failed to provide consent for his immediate medical needs in a timely manner following his hospitalization in late December 2021, as well as ongoing concerns regarding Parents' inability to appropriately parent him. Parents' failure to provide timely consent, the petition alleged, necessitated removal of 117 centimeters of dead bowels from Child during subsequent surgeries. BCCYS later filed amended petitions alleging a history of domestic violence between Mother and Father. The docket also reflects that GAL participated in the dependency proceedings.

On January 20, 2022, BCCYS petitioned the court for emergency custody of Child. On the same date, BCCYS received a report that Hershey Medical Center obtained a 24-hour right to custody of Child. On January 21, 2022, Child was removed from Parents' custody pursuant to an Emergency Order. Upon Child's release from the hospital, he was placed in a licensed foster home.

The court held a series of evidentiary hearings between January 2022 and August 2022. On August 12, 2022, the court denied BCCYS's petition to declare Child dependent. BCCYS timely appealed to this Court, and both BCCYS and the court complied with Pa.R.A.P. 1925.

Appellants raise a single issue in this appeal: "Did the trial court err in failing to adjudicate Child dependent, as Child was without proper parental care or control necessary for his physical, mental, or emotional health, or morals, in accordance with 42 Pa.C.S.[A.] § 6302(1)?" Appellant's Brief at 3.

- 2 -

The Juvenile Act defines "dependent child" in relevant part as a child who:

(1) Is without proper parental care or control, subsistence, education, as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of parental care or control may be based upon evidence of conduct by the parent .... that places the health, safety, or welfare of the child at risk...

42 Pa.C.S.A. § 6302(1). Child abuse is defined as intentionally, knowingly, or recklessly causing "serious physical neglect of a child." 23 Pa.C.S.A. § 6303(b.1)(7). Serious physical neglect of a child is defined as "any of the following when committed by a perpetrator that endangers a child's life or health, threatens the child's well-being, causes bodily injury or impairs a child's health, development or function: ... the failure to provide a child with the adequate essentials of life, including ... medical care." 23 Pa.C.S.A. § 6303(a).

In order to adjudicate a child dependent, the court must determine that this standard has been met by clear and convincing evidence. *In re L.V.*, 127 A.3d 831, 835 (Pa. Super 2015). "Proper parental care" is that care which addresses the particular needs of the child, and which, at a minimum, is likely to prevent serious injury to the child. *In re A.S.*, 63 A.3d 345, 349 (Pa. Super. 2013). The "clear and convincing evidence" standard requires "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the precise facts at issue." *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010). "Clear and

convincing evidence," however, does not require that evidence be uncontradicted. *Id.* Further, "a trial court has the discretion to accept or reject a witness' testimony, including that of an expert, and is free to believe all, part or none of the evidence presented." *In re Bosley*, 26 A.3d 1104, 1111 (Pa. Super. 2011).

An appellate court will accord great weight to the hearing judge's findings in a dependency case, because the hearing judge is in the best position to observe and rule upon the credibility of witnesses. *In re C.B.*, 264 A.3d 761, 778 n.31 (Pa. Super. 2021). Accordingly, an appellate court will not overrule the findings of the trial court in a dependency case if they are supported by competent evidence. *Id.*

The evidence reflects that a series of disputes arose between medical providers and Parents relating to Child's medical treatment after Parents brought Child to Penn State—St. Joseph's Hospital on December 26, 2021. The first dispute concerned Parents' resistance to consenting to Child's transportation by helicopter to Penn State Milton S. Hershey Center. The court summarized the evidence on this issue as follows:

> BCCYS alleged abuse for the alleged delay in transport from Penn State—St. Joseph's to Penn State Milton S. Hershey Medical Center and for a delay to consent for treatment. The testimony on these issues was primarily from Dr. Sareen and Dr. Safford.
>
> The testimony by Dr. Sareen, one of the treating physicians of Penn State—St. Joseph's Hospital, confirmed that he began working at 6:00 a.m. on December 26, 2021. He reported that within the first ten minutes or so of his shift that he would have gone to the Child's bedside, examined him and determined that

- 4 -

there might have been something severe going on . . . in the Child's abdomen. He immediately ordered a CAT scan of the abdomen and the Child was taken for the scan around 6:30 a.m. or 6:35 a.m. He was uncertain when the Child arrived at the hospital but suspected it was 5:30 a.m. The results of the CAT Scan came back around 7:00 a.m., and Dr. Sareen diagnosed the Child with intestinal angioedema, which is edema in the bowel wall indicating that the bowel is having backup blood flow to the intestine. This condition could lead to septic shock and death. There was no perfusion or diminished perfusion which suggested a possibility of needing surgery. Dr. Sareen immediately called a pediatric surgeon at Hershey Medical Center to consult regarding the Child. He relayed his findings to the parents and "He (Father) did not seem impressed at all as to what I was saying, ..." Dr. Sareen reported that he would be contacting the pediatric surgeon at Hershey Medical Center and the Child may need to go to that facility. He reported that Father had a significant number of questions as to why the Child could not stay at Penn State—St. Joseph's. Dr. Sareen testified that after he spoke with Dr. Safford, a pediatric surgeon at Penn State—Hershey Medical Center, sometime between 7:07 a.m. and maybe 7:30 a.m., he informed the parents that they would be transporting the Child via helicopter to Hershey Medical Center, and that led to significant concerns and questioning by Father. Father said, "I thought you said that you were going to transport him by ambulance." Father inquired if he could be allowed to fly with him (Child).

On cross-examination, Dr Sareen confirmed that the Child arrived around 4:49 a.m. EST, some testing for COVID was done, along with other bloodwork, a CAT scan was done at 7:10 a.m., and another doctor was involved in Child's care prior to him coming on duty at 6:00 a.m. Dr. Madtes probably evaluated the Child around 5:15-5:30 a.m. and ordered the initial diagnostics. Initially, Dr. Sareen stated that they were going to transport the Child via ambulance and did not specify air ambulance. Initially, the transport form that parents were asked to sign and did sign at 7:45 a.m. was checked for ALS Ambulance, not air ambulance. Then, the ALS Ambulance box was crossed out and a second box was checked for helicopter. Dr. Sareen recalls having a conversation and clarifying the transportation issue with parents. Dr. Sareen admitted that he did not wait for the parents to have a full understanding of the transportation situation and did what he needed to do to provide appropriate transport. The helicopter received dispatch at 7:24 a.m. and was en route to Penn State—

St. Joseph's at 7:44 a.m. Parents consented at 7:45 a.m. and the helicopter arrived at 8:05 a.m. Dr. Sareen was asked, "But in this case, based on the timeline that is involved, there was no delay in the Child getting on that helicopter and getting to Hershey caused by the parents disagreeing with you, was there?" Dr. Sareen responded, "I mean, if you're saying that as far as the delay, I don't know. I don't think so. You know, I made a phone call, the helicopter deploys, the helicopter gets there, and the patient is transferred."

BCCYS also called Dr. Safford, the Chief of Pediatric Surgery at Penn State—Hershey Medical Children's Hospital to testify at the March 18, 2022 hearing. He testified that he received a call from St. Joseph's on December 26, 2021 regarding a child and he recommended that the patient be sent by helicopter to Penn State—Hershey Medical Children's Hospital. He was told by the ER doctor (Dr. Sareen) that the Child was lethargic, not interacting, had poor colorization and significant abdominal distension. He reported that the Child arrived at his hospital within an hour or two of his conversation with the St. Joseph's doctor. Upon his examination of the Child, he noted several findings including abdominal distension and got him immediately to the operating room for emergent exploration. The parents were not at the hospital when the Child was being prepared for surgery because they were still driving to Penn State Hershey Medical Center and the helicopter got there first. Dr. Safford reached out to the parents by phone with three successive calls, while the Child was being intubated at the number provided by the helicopter crew. He was unable to reach them. He did receive a call back within 10-15 minutes. He reviewed with Parents over the phone how sick the Child was and what possible procedures could be done for the Child depending on whether the bowel is dead or some of the bowel is dead. Father took the information in, stated he was on his way, verbally consented to the surgery and said they could talk after the surgery.

Prior to conducting the initial surgery, Dr. Safford reported they did not have medical history upon receiving the child but noted that he was a preemie with necrotizing enterocolitis and had drains placed. He did report that he spoke with the parents later that night and discussed what he found, what he saw in the operating room and this is generally something that would not occur over a day. Parents discussed that they were seeing their pediatrician, spoke to the office within 12 hours of going to St.

Joseph's and got more concerned when the Child seemed to get sicker. The doctor testified that the condition the Child experienced would occur over an 18-36 hour window. It should be noted that Dr. Safford referenced distension would be present and he was told by the ER physician that there was distension. He reports that distension would be present in the first 6-12 hour window and it is seen throughout the 3 phases. However, it should also be noted that the original ER physician, Dr. Madtes, noted there was no distension on his examination and the Life Lion Crew noted in their physical findings assessment that the abdomen was non-distended.

Dr. Safford also testified as to two additional abdominal surgeries that the Child had to undergo while in his care and the difficulties or "battle antagonistic relationship" he referenced with getting consents from the parents. He stated that at one point he tried to get Mother's consent for surgery at bedside and she refused to consent without Father coming on the phone as well. Mother took a photo of the consent, sent it to Father, and Father requested that it be redone in better handwriting so they could read it. It took parents about forty-five minutes to consent to the surgery. Again, on cross-examination, Dr. Safford was questioned about whether there was any damage or harm to the Child as a result of the 30-to-45 minute delay and he stated, "There was no delay— there was no damage to the Child for that delay." Parents did consent to all the suggested surgeries.

Dr. Safford testified that he felt there was delay in getting Child to the hospital and they were making it harder to get the Child to the operating room. Specifically, he referenced the helicopter delay, but Dr. Sareen, who was present for the consent for the helicopter, stated he did not think there was a delay as he requested the helicopter prior to obtaining consent. In response to the question as to whether the parents should have brought him to the hospital on December 25, 2021 (Christmas Day), Dr. Safford's response was "I would say 24th or 25th. My guess, just based on the history, really 24th based on his appearance." On cross-examination, Dr. Safford looked at the Report titled General Medical Complaint PED by Dr. Kevin Madtes dated 12/26/21 at 5:36 a.m. that referenced the Child as having a soft abdomen, not tender, nondistended with normal bowl sounds. Dr. Safford indicated that he was surprised by that assessment given what he saw and opined that this had to be done by "someone that does not take care of children and not a surgeon."

Mother was called as a witness by BCCYS and her counsel during a hearing on July 8, 2022. Mother provided general medical background regarding the Child inclusive of his premature birth and several months of hospitalization following birth at Reading Hospital and CHOP, as well as general information regarding specialists he saw following his hospitalization after birth. She explained that "many of his visits were via Zoom due to COVID restrictions." Mother went on to testify what gave rise to the parents' concerns on December 25, 2021. She reported that the Child was fine and then suddenly, he was fussing more than usual, about twenty minutes. As a result, she and Father decided to call the Kimberton Clinic, Child's pediatrician, and voice their concerns. In response to their call, Mother reported that if there were any more concerns to call them back. Later that night, the child threw up once and the parents did not want to wait to call the pediatrician and they called emergency. Mother stated that they checked his belly to see if he was sore or uncomfortable and he seemed fine. He did not seem lethargic but was not as cheerful as normal. Throughout the course of Mother's testimony on this date, it was clear to this court that the period of December 25, 2021 through the filing of the Dependency Petition, Mother was extremely concerned about the medical condition of her son, that his condition rapidly changed throughout the course of treatment, and that the circumstances took a major toll on this family.

Father was called as a witness by BCCYS and his counsel during a hearing on July 8, 2022. He was asked about the events on December 25, 2021 that led to the Child being taken to the hospital. He reported that he and Mother decided to call the Clinic when the child was acting differently and they were uncertain as to what was wrong. He stated that the Child was crying and that was why they called the pediatrician. Child did not appear to be in pain. He spoke with the clinic and was told that based on what he described it did not seem like an emergency but if it progressed to call back. He stated that after the Child threw up once, they called 911. EMS responded in about thirty minutes. It was early in the morning on December 25, 2021 when the EMS arrived. Like Mother, it was clear throughout the course of Father's testimony on this date, that throughout the period of December 25, 2021 through the filing of the Dependency Petition, Father was extremely concerned about the medical condition of his son, that his condition rapidly changed throughout the course of treatment,

and that the circumstances, inclusive of his prior experiences with his son's medical issues after birth, took a major toll on this family.

Trial Court Opinion, 9/29/22, at 5-11 (record citations omitted; minor revisions for clarity). In addition, Dr. Safford testified that upon Child's arrival at Penn State—Hershey following helicopter transportation, "he was very toxic appearing. He was not interacting . . . that is when a child is about to die . . . . This was by far one of the sickest children that I had seen that did not die." N.T., 3/18/22, at 67-68.

Child underwent three surgeries over several days that resulted in loss of 117 centimeters of necrotic bowel. The first operation was to remove the dead bowel; the second was to sow the intestine back together; and the third was to close the abdomen. *Id.* at 79 (Safford). This was "emergency surgery." Id. at 82. Father questioned why the second or third surgery was necessary but ultimately consented to each procedure. *Id.*

> The court concluded:
> Despite Dr. Stafford's testimony regarding what he perceived as a delay in the parents taking the Child to the hospital, it is clear from the testimony provided by Parents, which is deemed credible by this court, regarding the Child's condition on December 25, 2021 at their home, calling the pediatrician on Christmas because of their concerns, then contacting 911 when the Child threw up and they felt he progressed, and Dr. Madtes' initial examination report and the Life Lion report previously referencing that the Child's abdomen was not distended, there is not clear and convincing evidence that the parents in this matter caused any delay in getting the Child to the hospital on December 26, 2021 to seek treatment. There was no clear and convincing evidence that Mother or Father acted in an intentional, knowing or reckless way to substantiate a finding of abuse pursuant to 23 Pa.C.S.A. § 6303(b.1). As Dr. Stafford aptly stated during his testimony, minutes make a difference in a child's care because, unlike in an adult, they look relatively well until they are ready to die. It is

- 9 -

clear from the testimony that even when the Child presented to the BPS via ambulance, the initial doctor, who must have formal medical training, failed to recognize that this Child was having a serious medical condition.

Trial Court Opinion, 9/29/22, at 11-12.

BCCYS alleges that the evidence compels an adjudication of dependency, and a finding of abuse, based on Parents' delay in (1) taking Child to the hospital, (2) consenting to transportation of Child by helicopter from Penn State—St. Joseph Hospital to Penn State—Hershey Medical Center and (3) consenting to surgery. We hold that the court's findings are supported by competent evidence. With regard to the delays in taking Child to the hospital and transporting Child by helicopter, the evidence credited by the court demonstrated that Parents were genuinely concerned over Child's condition, as shown by their call to the pediatrician on Christmas Day and their subsequent call to 911 when Child threw up. Equally as importantly, while it was evident that Child was ailing, it was difficult for anyone but a pediatric surgeon such as Dr. Safford to tell that Child was in immediate danger of dying. Even Dr. Madtes, the first physician who examined Child in Penn State—St. Joseph's emergency room on the morning of December 26, 2001, did not recognize perhaps the most critical physical symptom, a distended abdomen. Finally, while Parents initially resisted the transportation of Child by helicopter to Penn State—Hershey Medical Center, they provided consent before the helicopter arrived, so their initial refusal to consent did not delay Child's life-saving surgery at Penn State-Hershey.

J-A04009-23

BCCYS also sought an adjudication of dependency based on Parents' insistence that Child be weaned from various controlled substances faster than medical providers thought advisable. The court summarized the evidence as follows:

[BCCYS] offered Dr. Susannah Eckman, an expert in the field of palliative care for children, from Penn State Hershey Medical Center to testify as to the weaning off of morphine process for this Child and the difficulties she encountered while interacting with the parents. She explained that she was involved with this Child in order to assist in the weaning off process of morphine to allow the Child to transition to a step-down unit to from the intensive care unit. She reported as others that when she would interact with Mother alone, she would immediately call Father on the phone and he would do most of the talking. During the weaning process, Mother expressed a concern that the Child was always vomiting after a particular medication was administered. Dr. Eckman did not find that to be the case and felt like the parents were trying to get the Child off the medication quicker. She reported that due to pressure from the family, there was a rapid escalation of weaning off the infusions.

Dr. Eckman stated that prior to the last day of the weaning process, she met with the parents and explained to them that the Child was showing some mild signs of withdrawal so they were not going to wean on that particular day and see if it could be changed the following day. The next day, the hospital attempted to administer that 8 a.m. dose and the parents refused. She thinks the dose was given an hour and half late due to the refusal. She went onto explain that a late or missed dose is a risk of performing withdrawal.

On cross-examination, Dr. Eckman again reported that the parents withheld information. She acknowledged that she did review the inpatient consult report and as a result was aware that Father expressed challenges the family experienced when the Child had a five month natal intensive care unit stay due to his premature birth, that the Father thought the Child was in the hospital longer that was necessary due to a lack of planning for discharge, and that the Father was hoping to have a quick plan

- 11 -

for discharge from the hospital since the Child was now in recovery. She explained that the information that was withheld was about social history and that was odd. She reported that they continued to consult with the parents regarding the weaning process every day of the hospitalization until he was weaned off.

Dr. Eckman went on to further explain the WAT scores for measuring withdrawal. She explained that they are determined by looking back over at least a four-hour period of time and look at sneezing, yawning, time to console the child, vomiting, diarrhea and temperature. The Child was weaned off the morphine on January 20, 2022 but only started the clonidine wean on January 25, 2022. Clonidine was weaned after the last dose on January 28, 2022. A January 19, 2022 note reported that parents brought up a concern about vomiting. Parents reported that they were concerned that Child's WAT score was being affected due to his vomiting because of his feeding issues rather than an addiction to morphine or another drug. She agreed that it was fair to say that a parent may have a serious concern that their Child was addicted to a drug like morphine but it is extraordinarily common as a sequalae of critical illness. She also acknowledged Dr. Riley O'Neil's report that parents had concerns about vomiting and their desire to have an aggressive wean schedule. She acknowledged that the team felt comfortable doing the aggressive wean to placate the parents' desires and at the same time ensuring that the Child would be safe at all times during the wean. There was never a life-threatening issue or long-term damage as a result of the wean approach that was done at the hospital. She acknowledged that this wean was not the preferred way to accomplish it but the Child was safely weaned. Dr. Eckman again reported that the last dose was refused/delayed but on cross-examination, Dr. Eckman confirmed that Father asked to speak to the team to make sure everyone was on the same page. She reported that Father was confused about the conversation the day prior and reported he was not comfortable with the nurse that spoke with him this morning. The team was consulted, and it was confirmed that the dose was needed and it was administered. She also confirmed that Father did not threaten to remove the Child against medical advice at any time that she was involved in this case. She reported that there were concerning statements suggesting that but it was not said.

- 12 -

Trial Court Opinion, 9/29/22, at 13-15 (record citations omitted; minor revisions for clarity).

The court concluded that Parents exercised proper parental care with regard to weaning:

> [T]he transcripts are replete with the parents asking questions and presenting their concerns to the medical staff. Parents were actively involved in their Child's care and asked many questions of the staff. Parents wanted their Child weaned off the morphine and clonidine as quickly and safely as possible. As Father stated during his testimony, "if he needs something, it could be on another planet, he would get it."
>
> Mother testified about her position regarding the weaning schedule for the Child at the July 8, 2022 hearing. She stated that the Child had required doses and optional doses. The Child received all the required doses. She reported she does not recall refusing six of the optional doses but may have refused one or two of the optional doses. She stated if the Child was feeling uncomfortable, she would want him to get what he needs. She reported that she and Father wanted the Child off the morphine as soon as possible because they wanted the Child home as soon as possible. She reported that they worked with the doctors to come up with a plan.

Trial Court Opinion, 9/29/22, at 15 (record citations omitted; minor clarifications for style).

Once again, the court's factual findings are supported by evidence of record. BCCYS argued below and in this Court that Parents were irrational obstructionists who did not care about their child's suffering and who were bent upon interfering with trained medical professionals' efforts to wean their child from harmful drugs. The court, however, was in the best position to observe and rule upon the credibility of witnesses, *In re C.B.*, 264 A.3d at

778 n.31, and it chose to believe that Parents were deeply concerned about the Childs' welfare and strove to work with hospital personnel to create the best treatment plan. Since the record contains evidence that supports this determination, we are not free to overrule it. *Id.*

BCCYS makes an impassioned plea in its brief for this Court to override the trial court's refusal to make a declaration of dependency. Although BCCYS emphatically states its view that Parents are unfit to care for Child, we cannot disregard the fact that the trial court patiently sat through a series of hearings and carefully reviewed the evidence in entering its decision against BCCYS. For this reason, and for the others given above, we affirm the trial court's determination that BCCYS failed to present clear and convincing evidence in support of its dependency petition.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2023